# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 24-203V

|  |  |
|---|---|
| BARBARA MILES, | Chief Special Master Corcoran |
| Petitioner, | Filed: August 7, 2025 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Bridget Candace McCullough*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Dima Jawad Atiya*, U.S. Department of Justice, Washington, DC, for Respondent.

## FINDINGS OF FACT[1]

On February 9, 2024, Barbara Miles filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges a Table claim – that she suffered a shoulder injury related to vaccine administration ("SIRVA") after receiving an influenza ("flu") vaccine on September 30, 2022. *Id.* The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

A disputed fact issue has arisen regarding whether Petitioner's injury meets the Act's "severity requirement." For the reasons discussed below, I find it more likely than not that Petitioner can establish this claim element.

---

[1] Because this Fact Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I.   **Relevant Procedural History**

Respondent filed a Rule 4(c) Report on October 28, 2024, contending that Petitioner has not established that she suffered her alleged SIRVA for more than six months post-vaccination. ECF No. 17 at 7. Specifically, her last records referencing left shoulder pain or treatment was on March 17, 2023 – five months and 17 days post vaccination. *Id.* at 8 (internal citations omitted). Respondent argues Petitioner's attestations of ongoing pain are inconsistent with the medical records that show gaps in treatment and continued care for other ailments. *Id.* at 9. The issue of severity is thus ripe for consideration.

II.   **Relevant Authority**

Pursuant to Section 13(a)(1)(A) of the Vaccine Act, a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19.

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of*

*Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed, or varied, by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### III. Finding of Fact Regarding Severity

I make this finding after a complete review of the record to include all medical records, affidavits, and additional evidence filed, and in particular the following:[3]

- Petitioner received the flu vaccine in her left deltoid at a local pharmacy on September 30, 2022. Ex. 1 at 3.

- Approximately two weeks post vaccination, on October 13, 2022, Petitioner had a call with her primary care provider ("PCP")'s office for left shoulder

---

[3] While I have reviewed all the evidence filed to-date in this case, only evidence related to a determination of severity will be discussed herein, though other facts may be provided as necessary.

    pain. Ex. 2 at 495. Petitioner stated she had pain since receiving the flu vaccine on September 30, 2022. *Id.* Petitioner reported "pain with overhead lifting," an inability to sleep on the left side, and a "bone pain." *Id.* She noted she had "good range of motion [("ROM")] but admit[ted] to pain." *Id.* Petitioner stated she was taking Tylenol PM and was using a heating pad "without much relief." *Id.* The assessment included an injection site reaction; specifically, that "this is likely NOT an allergic reaction to the flu vaccine itself but rather an injection issue." *Id.* at 496 (emphasis in original). The treater recommended heat and Tylenol for the pain. *Id.*

- Later that same day, Petitioner sent a message to her PCP's office stating that she contacted the pharmacy where she received the subject vaccination and reported shoulder pain. Ex. 2 at 523. She was informed that the pain "usually goes away within three days." *Id.* Petitioner's treater advised her to continue "conservative" treatment with nightly Motrin. *Id.*

- On October 18, 2022, Petitioner messaged her PCP reporting left shoulder pain "since [her] flu injection." Ex. 2 at 522. Petitioner stated that she had "been taking Motrin and using the heating pad to no avail." *Id.* Petitioner questioned next steps and inquired about physical therapy ("PT"), or a cortisone shot. *Id.* at 522-23. Petitioner was prescribed Mobic (meloxicam) and referred to orthopedics. *Id.* at 528.

- Petitioner had an orthopedic evaluation for left shoulder pain on November 9, 2022. Ex. 3 at 7. Petitioner reported her pain began after a flu vaccination on September 30, 2022. *Id.* She noted that meloxicam "did not help." *Id.* Upon examination, Petitioner had "external rotation with pain," pain with resisted forward flexion and abduction, normal strength, and positive impingement signs. *Id.* The orthopedist opined that Petitioner had "an impingement likely related to bursitis caused by the shot." *Id.* Petitioner received a steroid injection. *Id.*

- On January 24, 2023, Petitioner saw her PCP for her annual wellness visit. Ex. 2 at 576. Petitioner reported that she "started to have significant shoulder pain after she got a flu shot at [her local pharmacy]." *Id.* at 578. Petitioner also noted an orthopedist had diagnosed her with bursitis and that she "felt better after she had a steroid injection." *Id.* An examination showed normal ROM. *Id.* at 579. Petitioner's visit diagnoses included "acute pain of left shoulder" that was "secondary to bursitis after . . . flu shot," and the PCP noted that Petitioner was "doing better." *Id.* at 580.

4

- The next month, on February 14, 2023, Petitioner contacted her PCP requesting referrals for an MRI and PT to address her ongoing left shoulder pain. Ex. 2 at 613-15. Petitioner stated that "[a]lthough most of the pain was taken away by the Cortizone [sic] shot a couple months ago, [she was] still having pain in that arm (especially when [she] wake[s] up)." *Id.* at 615. Petitioner was "worried that the intense pain w[ould] return." *Id.*

- Petitioner had an initial PT evaluation on March 7, 2023. Ex. 4 at 15. She reported that her left shoulder pain began after her September flu vaccination and she "immediately had L[eft] shoulder pain and was unable to move her arm for a couple weeks." *Id.* Petitioner stated that she "received a cortisone injection in late November and since her shoulder has been feeling better and she has been able to move it more." *Id.* She explained that she was "currently experiencing shoulder tightness in the AM" but her sleep was "undisturbed." *Id.* Petitioner rated her current pain at a 4/10, with a range from 2-6/10. *Id.*

- Upon examination, the treater noted pain with left shoulder abduction and external rotation, but Petitioner's ROM was otherwise within normal limits. Ex. 4 at 15-16. Despite the notation regarding a normal ROM, the treater's assessment included "weakness and limited ROM in the L [sic] shoulder." *Id.* at 16. The treater recommended PT twice a week for six weeks – or through approximately April 18, 2023. *Id.* at 17.

- The next day (March 8, 2023), Petitioner went to a minute clinic for nasal and head congestion. Ex. 2 at 263. There was no mention of shoulder pain at this visit and a physical examination revealed normal ROM. *Id.*

- Petitioner had PT visits scheduled for March 9, 13, 15, and 17, 2023, but she did not attend any of these scheduled visits. Ex. 4 at 4-13.

- On March 17, 2023, Petitioner requested to be discharged from PT; the treater noted that "no reason [was] given." Ex. 4 at 4-7, 9-10. The "instructions" from this date included "discharge" but also to "[p]rogress [upper extremity] exercises and improve pain free ROM." *Id.* at 10. At the time of discharge, Petitioner filled out a "patient outcomes" questionnaire and rated her pain at a 3/10. *Id.* at 8. She also noted mild-to-moderate difficulties with activities of daily living including opening a jar, household chores, carrying bags, washing her back, and preparing food. *Id.*

- Between March 13 and March 27, 2023, Petitioner communicated with her PCP regarding a COVID diagnosis and accompanying symptoms. Ex. 2 at 629-41, 646-49. And, on March 26, 2023, Petitioner went to a minute clinic for nasal congestion. *Id.* at 652. Petitioner did not mention shoulder pain during this time.

- Six months and one day post vaccination (on March 31, 2023), Petitioner had an appointment at her PCP's office for an unrelated sinus issue. Ex. 2 at 656-68. There was no mention of shoulder pain at this visit or thereafter. *See id.* at 674-758, 764-93, 808-53.

- In her affidavit (drafted in February 2024), Petitioner attested that her shoulder is still "very sore when it rains" and she still has "difficulty lifting [her] arm all the way up." Ex. 5 ¶ 16. She explained why she discontinued PT and noted that her "experience from the start was not a good one." *Id.* ¶ 12. Specifically, she was "dismayed" with her assigned therapist after he did not greet her upon entry to the facility. *Id.* Petitioner attested that she went back to PT "on one occasion, but then did the exercises at home for a long time." *Id.* ¶ 13.

- No additional evidence regarding the severity of Petitioner's injury has been submitted.

## ANALYSIS

The Vaccine Act requires that a petitioner demonstrate that "residual effects or complications" of a vaccine related injury continued for more than six months. Vaccine Act § 11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. § 13(a)(1)(A). To satisfy the six-month requirement, "[a] potential petitioner must do something more than merely submit a petition and an affidavit parroting the words of the statute." *Faup v. Sec'y of Health & Hum. Servs.*, No. 12-87V, 2015 WL 443802, at *4 (Fed. Cl. Spec. Mstr. Jan. 13, 2015). Rather, a petitioner is required to "submit supporting documentation which reasonably demonstrates that the alleged injury or its sequelae lasted more than six months[.]" *Id.*

Additionally, "the fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *See Morine v. Sec'y of Health & Hum. Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Hum. Servs.*,

No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) (finding that a petitioner suffered from residual symptoms that due to their mild nature did not require medical care and thus that "a discharge from medical care does not necessarily indicate there are no residual effects"). In another SPU case, where a petitioner's last treatment was at five months and nine days, the petitioner was found to meet the six-month requirement. *Schafer v. Sec'y of Health & Hum. Servs.*, No. 16-0593V, 2019 WL 5849524 (Fed. Cl. Spec. Mstr. Aug. 28, 2019). In that case, based on the petitioner's symptomology and progression, the special master noted that it was unlikely "that petitioner's shoulder symptoms would have resolved within [the next] 22 days." *Id*. at *7.

In this case, there appears to be no dispute that Petitioner received the flu vaccine on September 30, 2022, and that the onset of her post-vaccination shoulder symptoms occurred within 48 hours of the subject vaccination. *See* ECF No. 17 at 9-10 (objecting to the diminished ROM Table SIRVA requirement, only). She therefore must demonstrate by preponderant evidence that her residual symptoms continued for more than six months thereafter from onset, or through April 2, 2023 (at the latest). *See,* e.g., *Herren,* 2014 WL 3889070, at *3.

The records discussed above establish that on March 17, 2023 (merely *15 days* shy of the severity "cut-off"), Petitioner filled out a form rating her pain at a 3/10 and describing mild-to-moderate difficulty performing certain activities due to her shoulder pain. Ex. 4 at 8. More so, just ten days prior to this visit (at her first PT visit on March 7th), Petitioner rated her pain similarly (ranging from a 2-6/10), and she had pain with abduction and external rotation of her left shoulder on examination. *Id.* at 15-16. Accordingly, additional PT was recommended to address these ongoing symptoms, for six weeks or through *mid-April* 2023 (at the earliest). *Id.* at 17.

These record notations, paired with a proposed continued treatment course as of March 2023 (approximately six months post vaccination), provide evidence that Petitioner's injury was at this point likely ongoing, and that her treating physician did not predict that the injury was likely to resolve soon thereafter – or even within the next few weeks. *See,* e.g., *Schafer,* 2019 WL 5849524, at *7.

I also do not construe Petitioner's decision to cease treatment after March 17, 2023 (or not to return to PT), as compelling evidence that her injury had resolved by that time. Rather, Petitioner's treatment cessation has a sufficiently reasonable explanation (that she had a perceived unpleasant experience with PT and therefore continued to perform the exercises at home for an extended period of time). *See* Ex. 4 at 10 (a March 17, 2023 PT discharge instruction to progress her upper extremity exercises to improve symptoms of pain with ROM); *see also* Ex. 5 ¶ 13 (stating that after PT, she "did the exercises at home for a long time."). While Petitioner did obtain treatment after March 17, 2023, for

7

non-shoulder related, acute issues, I do not conclude from this that her alleged SIRVA had likely resolved fully by this time or by the end of March/early April.

Compared to other SIRVA injuries, however, Petitioner's left shoulder pain and related symptoms do not appear to have been especially severe, even at the time she did obtain treatment. And significantly, she did not seek follow up care after March 2023 – which if nothing else underscores the mild nature of her injury. Although the medical records do allow for the conclusion that Petitioner's injury meets the Act's severity requirements, those same records establish an injury that will not entitle Petitioner to anything more than a fairly modest award of pain and suffering.

## Conclusion and Scheduling Order

Petitioner has just barely established the Vaccine Act's temporal severity requirement. I will note, however, that Respondent's remaining objection to a Table SIRVA[4] (not discussed in this Ruling) *could* ultimately require more evaluation. I thus *strongly* encourage the parties to promptly attempt an informal resolution of this claim before expending any further litigative resources on the case. If at any time informal resolution appears unlikely, given that the claim has been pending in SPU for over one year (having been assigned in May 2024), the parties should propose a method for moving forward, i.e., with a proposed briefing schedule or otherwise stating how they wish to proceed.

Accordingly, **by no later than Monday, September 22, 2025**, the parties shall file a joint status report confirming the date on which Petitioner conveyed, or intends to convey, a reasonable settlement demand and supporting documentation for Respondent's consideration. The status report may also state whether Respondent wishes to file an amended Rule 4(c) report and, if so, proposing a date for submission.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u><br>
Brian H. Corcoran<br>
Chief Special Master

---

[4] Respondent also contested that Petitioner could establish a Table SIRVA claim, as she never had documented reduced ROM on examination, but rather only exhibited pain with motion. ECF No. 17 at 9 (citing Ex. 3 at 7).